2. WILLS (§ 439*)—CONSTRUCTION.
   The intention of testator, as gathered from the will, is to govern.
   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 952, 955, 957; Dec. Dig. § 439.*]

3. WILLS (§ 455*)—CONSTRUCTION.
   Where testator employs language clear, definite, and incapable of any other meaning than that conveyed by the words used, the rules of construction invoked in case of an ambiguous will do not apply.
   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 972, 973, 976; Dec. Dig. § 455.*]

4. WILLS (§ 756*)—"GENERAL LEGACY."
   A legacy is a "general legacy," and not specific, where so given as not to amount to a bequest of a particular thing or money, distinguished from all others of the same kind.
   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 1949–1955; Dec. Dig. § 756.*
   For other definitions, see Words and Phrases, vol. 4, pp. 3071–3073; vol. 8, p. 7670.]

5. WILLS (§ 818*)—CONSTRUCTION.
   Testator bequeathed an equal sum to each of six charitable institutions, but provided that, if such bequests should exceed one-half of the personal estate of which he died possessed, such a proportionate amount should be taken from each as would reduce the sum thereof to one-half of his personal estate, but that, if the sum of the bequests should not equal one-half of the personal estate of which he died possessed, such an equal amount should be added to each bequest as would make the sum of the bequests equal to one-half of his personal estate. All the remainder of the estate he directed his executors to dispose of as therein provided. Held, that the amount of the legacies to the charitable institutions was determined by one-half of the value of the personal estate at testator's death, not at the time of distribution.
   [Ed. Note.—For other cases, see Wills, Cent. Dig. § 2112; Dec. Dig. § 818.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Judicial settlement of the account of the executors of Joseph F. Barton, deceased. Account settled.

W. A. Matteson, for executors.

E. A. Rowland, special guardian, for Mildred A. Peck, minor.

C. Lansing Jones, for Home for Aged Men and Couples.

Charles A. Miller, for Home for the Homeless.

Charles B. Mason, for House of the Good Shepherd.

Charles A. Talcott, for Utica Orphan Asylum.

Julius T. A. Doolittle, for St. Luke's Home and Hospital.

SEXTON, S. On the 16th day of February, 1908, said Barton died, leaving a will dated April 9, 1904, which was probated March 30, 1908. On June 16, 1909, the executors filed their annual account. On the return of the citation, June 28, 1909, Home for Aged Men and Couples, Home for the Homeless, House of the Good Shepherd, Utica Orphan Asylum, and St. Luke's Home and Hospital, legatees, filed objections to the account which require a construction of the will.

By its terms the testator gave $30,000 to each of the following named institutions of Utica, N. Y.: Home for Aged Men and Couples, Home for the Homeless, House of the Good Shepherd, St. Luke's Home and Hospital, St. Elizabeth's Hospital, and the Utica Orphan Asylum. He gave $20,000 each to the American Home Missionary Society, the American Female Guardian Society, and Home for the Friendless, and $1,000 to Mary Stewart. The executors were directed to pay all debts, funeral and testamentary charges, and to use $1,000 for a monument, and $5,000 was given to them in trust for certain specified purposes. The testator then said:

"Sixteenth. In case the sum of all the bequests above made should exceed in value one-half of the personal estate of which I may die seised and possessed, I hereby direct my executors, hereinafter named, to take such a proportionate sum from the bequests made in second, third, fourth, fifth, sixth and seventh clauses of this my said will, namely the bequests to the Home for Aged Men and Couples, the Home for the Homeless in the city of Utica, the House of the Good Shepherd, St. Luke's Home and Hospital, St. Elizabeth's Hospital and Home, and the Utica Orphan Asylum, as will reduce the sum of all bequests heretofore made in this my will to one-half of my personal estate.

"Seventeenth. In case the sum of all the bequests above made should not equal in value one-half of the personal estate of which I may die possessed, I hereby direct my executors, hereinafter named, to add such an equal sum to each of the bequests made in the second, third, fourth, fifth, sixth and seventh clauses of this my said will as will cause the sum of all bequests heretofore made in this my said will to equal in value one-half of my personal estate.

"Eighteenth. All the rest, residue and remainder of the property of which I may die seised and possessed, or which may come to my estate after my decease, real, personal and mixed, of every name and nature and wheresoever situated, not hereinbefore disposed of, I hereby direct my executors, hereinafter named, to divide into five equal parts; and I hereby direct my said executors to divide one of such equal parts equally between John M. Barton and Jennie Rowland, the children of my deceased brother, John Barton, or their descendants per stirpes."

One-half of the estate of testator, at the time of his death, amounted to much more than the total of legacies; hence, instead of any of the six legacies to charity abating as provided by clause 16, they were each more than doubled under the provisions of clause 17. From the

wording of the sixteenth, seventeenth, and eighteenth clauses the executors concluded that the basis for the distribution of the estate, so far as the said six legacies to charity were concerned, was the value of the estate on the day of the testator's death. The inventory as of that date shows $113,116.06 in cash, $358,050 in bonds, and $411,772.05 in stock, making the then total estate $882,938.11.

In course of administration it appears that some securities were disposed of for less than their appraised value, while others were sold for more than their appraised value. An increase in market value at time of sale over the appraised value at time of death of testator of about $60,000 is shown, with interest and dividends of about $34,000. All but St. Elizabeth's Hospital, of the charitable institutions which basked in the sunshine of this good man's bounty, contend that the executors have misconceived the testator's intent, to their great damage and loss, in that the amount of their legacies has been determined by taking one-half of the appraised value of the estate at the time of the testator's death, instead of one-half of the total net estate at time of distribution. This construction, if upheld, would enable the contestants to share with the residuary legatees, under the eighteenth clause of the will, the interest, dividends, and increase in market value over appraised value, amounting to about $94,000.

Which of these contentions is borne out by the language of the will? To my mind, the will as a whole is very clear, and plainly mirrors the testator's intentions. In construing a will, the testator is always a proper subject for consideration. Anything in the record which bears upon his business methods, or mental clearness, may be properly considered in connection with any language used by him in his will for the purpose of ascertaining his intention.

I invoke another rule not laid down in the books, viz.: That courts and judges, in construing wills, as a general proposition, must take men by their words and asses by their ears. We have under consideration the will of a man by which he disposes of an estate of nearly $900,000. The inventory shows investments in about 80 different kinds of stocks and bonds, and a cash accumulation at the time of his death of over $113,000, deposited in eight different banks and trust companies. His investments were so shrewd that the estate in only one instance sustained a total loss, being the amount of five shares of stock in the Buell Tanning Company of Waterville, N. Y., amounting to $500. With such a man in mind, I feel forced to the conclusion that whatever he said in his will he meant.

Did he intend to give one-half of the value of his personal estate as it stood at the time of his death, as set out in the provisions of his will from the second to the fifteenth inclusive? At the beginning of the sixteenth provision he said:

"In case the sum of all the bequests made should exceed in value one-half of the personal estate of which I may die seised and possessed," etc.

And at the beginning of the seventeenth provision he said:

"In case the sum of all the bequests above made should not equal in value one-half of the personal estate of which I may die possessed," etc.

118 N.Y.S.—69

And at the beginning of the eighteenth provision he said:

"All the rest, residue and remainder of the property of which I may die seised and possessed."

In the three consecutive clauses of his will which are involved in this discussion he used the expression, "of which I may die seised and possessed." From these three expressions, two of them identical in language, and all identical in meaning, keeping in mind the character of the man making the will, it seems to me clear that the testator intended that his estate should be valued as of the time of his death, and that one-half of its value should be used to pay the legacies as provided by him in the separate provisions of his will, from the second to the seventeenth inclusive.

If the testator intended that one half of his net estate should be used in the payment of his bequests at the time of distribution, and the other half go to the residuary legatees under the eighteenth clause of the will, he should have, and I think would have, said so. That he did not intend to split his estate in two at the time of distribution clearly appears from the eighteenth provision of his will, in which he says, "All the rest, residue and remainder of the property of which I may die seised and possessed," meaning the other half of the appraised value of his estate at the time of his death, "or which may come to my estate after my decease, real, personal and mixed, of every name and nature, and wheresoever situated," meaning lapsed legacies, if any, interest and dividends, he knowing that his estate was largely made up of interest-bearing stocks and bonds, "not hereinbefore disposed of," meaning clearly the half of his estate in value at the time of his death which he had set aside to meet the requirements of the provisions of his will from the second to the seventeenth inclusive.

The expression "not hereinbefore disposed of," in the eighteenth clause of the will, does not mean, in my judgment, that the residuary legatees should share equally the interest and dividends and any other property which might come to the estate with the specific and general legatees. The will, taken as a whole, to my mind will not stand any such construction. The intention of the testator, as gathered from the whole will, is to govern. Quade v. Bertsch, 65 App. Div. 600, 72 N. Y. Supp. 916, affirmed in 173 N. Y. 615, 66 N. E. 1115, without opinion. When the testator employs language that is clear, definite, and incapable of any other meaning than that which is conveyed by the words used, the rules of construction that are invoked in cases of ambiguous wills do not apply. Wadsworth v. Murray, 161 N. Y. 274, 55 N. E. 910, 76 Am. St. Rep. 205.

The only way that the testator could have prevented interest, income, lapsed legacies, if any, and other property which might come to his estate, from falling into the residuary clause of his will, would have been by the use of words expressly showing an intention on his part to that effect. Matter of Benson, 96 N. Y. 500, 48 Am. Rep. 646. The character of the six legacies to charity precludes them from sharing in interest or income of this estate. They are general legacies. A legacy is general, and not specific, when so given as not to amount to a

bequest of a particular thing or money of the testator distinguished from all others of the same kind. To make a legacy specific, its terms must clearly require such a construction. The language of each of the six legacies to charities is, excepting name of legatee:

"I hereby give, devise and bequeath the sum of thirty thousand dollars ($30,000) to the 'Home for Aged Men and Couples, situated in the city of Utica, Oneida county, N. Y.'" Tifft v. Porter, 8 N. Y. 516.

"No legacies shall be paid by an executor or administrator until after the expiration of one year from the time of granting letters testamentary, or of administration, unless directed by the will to be sooner paid." Code Civ. Proc. § 2721.

It has been settled by the Court of Appeals that since, under said section 2721 of the Code, general legacies are not payable until one year after grant of letters, such a legacy does not begin to draw interest until that time. Matter of McGowan, 124 N. Y. 526, 26 N. E. 1098. Within one year from granting of letters testamentary, C. B. Miller, one of the executors, offered to pay $64,564.02 to each of the contestants and to St. Elizabeth's Hospital in full for their respective legacies, which sum they declined as a payment in full, but did accept the sum of $60,000 on account of their respective legacies. It appears by the account that each of said institutions was tendered more than it will now receive.

I hold and decide that the executors correctly construed the will, and that their plan for the distribution of this estate, as set out in the account on file herein, accords with the testator's intent, and that said account is a true and correct account of all proceedings in this estate. I hold and decide that each of said six institutions is entitled to $4,259.33, as provided for them in the account on file, in addition to the sum of $60,000 heretofore paid to each of them, but without interest, and subject to its share of the expense of this accounting.

Decreed accordingly.